UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CRYSTAL MILLER, | ) |
| Petitioner, | ) ) ) |
| v. | ) )  Case No. 4:24-cv-00536-SRC |
| UNITED STATES OF AMERICA, | ) ) ) |
| Respondent. | ) |

**Memorandum and Order**

Petitioner Crystal Miller asks the Court to set aside, correct, or vacate her sentence under 28 U.S.C. § 2255. She makes one argument: that she suffered from constitutionally ineffective assistance of counsel because her trial counsel, Jermaine Wooten, failed to seek a downward variance at sentencing based on Miller's history of abusive relationships. Having carefully reviewed the record, the Court holds that Miller has not demonstrated entitlement to relief or an evidentiary hearing under section 2255 and accordingly denies her motion.

**I.     Background**

**A.     Factual background**

Miller's guilty-plea agreement describes the following facts:

> Beginning at a time unknown, but at least from September 2019 through the date of the indictment (October 13, 2021), [Miller] knowingly joined with others to possess with the intent to distribute and to distribute crystal methamphetamine and fentanyl in the Eastern District of Missouri and elsewhere. Specifically, [Miller] was a member of a large[-]scale drug[-]trafficking organization ("DTO") operating in the Eastern District of Missouri that imported crystal methamphetamine and fentanyl from sources of supply located in Arizona and California and then distributed those drugs through its supply chain.

[Miller]'s role in the DTO was multifaceted.  First, [Miller] allowed the DTO to utilize her residences as a "stash" house to store and package fentanyl and crystal methamphetamine.  For example, in June 2020, investigators interdicted a package containing a half kilogram of fentanyl sent by co-defendant's [sic] Kenneth Thomas and Raymundo Deleon and destined for [Miller] at her residence at 6618 Minnesota in St. Louis.  After the package was interdicted, [Miller] moved to a residence at 7853 Birchmont in St. Louis where additional drug packages were sent for the DTO.  During the investigation, investigators observed drug packages sent directly to [Miller]'s residence or drug packages sent to other residences transported to Birchmont by DTO members.  In January 2021, a review of trash from the residence at Birchmont resulted in seizure of one kilogram wrapper containing suspected fentanyl, one clear plastic kilogram wrapper with a tan substance, and another kilogram wrapping.  A subsequent search warrant executed at Birchmont resulted in the seizure of five kilograms of crystal methamphetamine (or "ice"), a kilogram of fentanyl, 1.4 pounds of cutting agents, marijuana, and a firearm that did not belong to [Miller].  Also recovered were empty packages sent by Deleon to other addresses utilized by the DTO.  [Miller]'s fingerprints were found on a can containing crystal methamphetamine recovered during the search of Birchmont.  Co-defendant Stephen Griffin, Jr.'s fingerprints were also found on the cutting agents and packaging materials recovered during the search.

Second, aside from the storage of drugs, [Miller] admitted she assisted in the packaging of the drugs for sale and helped sell small amounts to cars sent to Birchmont by the DTO.

Finally, after the search warrant at Birchmont, [Miller] utilized an alias to rent an apartment for Stephen Griffin at 741 McKnight in St. Louis.  Investigators arrested Griffin carrying approximately a kilogram of crystal methamphetamine after exiting the apartment.  A subsequent search warrant executed on the apartment rented by [Miller] revealed approximately seven kilograms of crystal methamphetamine, 15 grams of fentanyl, a kilogram press, scales, and other indicia of drug trafficking.

Based upon the evidence and the parties' approximation of the controlled substances [that] are the subject of the conspiracy, the parties agree that the amount of controlled substances involved in the conspiracy attributable to [Miller] as a result of [her] own conduct, and the conduct of other conspirators reasonably foreseeable to her, is 90,000 kilograms or more of converted drug weight.

Guilty Plea Agreement at 3–5, *United States v. Miller*, No. 4:21-cr-00554-SRC-12 (E.D. Mo. June 14, 2023), doc. 742 ("Crim. doc.") (The Court cites to page numbers as assigned by CM/ECF.).

### B. Procedural background

#### 1. Criminal proceedings

In October 2021, a federal grand jury indicted Miller and 19 other defendants with various drug- and firearm-related offenses. Crim. doc. 6. The grand jury charged Miller with two counts: conspiracy to distribute and possess with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. § 846. *Id.* at 1–4. Twenty months later, in exchange for the United States's promise not to prosecute Miller further for distribution of crystal methamphetamine and fentanyl between September 2019 and the date of the indictment, Miller pleaded guilty to lesser-included charges in both counts. Crim. doc. 742 at 1. Miller admitted to knowingly violating 21 U.S.C. § 846, admitted that there was a factual basis for her plea as to both counts, and confirmed that she fully understood the elements of her crimes—namely:

1. That she entered into an agreement or understanding to distribute crystal methamphetamine and fentanyl;

2. That she voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some time while it was still in effect;

3. That, at the time she joined in the agreement or understanding, she knew of the purpose of the agreement or understanding; and

4. That the amount of actual methamphetamine involved in the conspiracy attributable to her as a result of her own conduct, and the conduct of others reasonably foreseeable to her, was five grams or more; and that the amount of fentanyl involved

3

in the conspiracy attributable to her as a result of her own conduct, and the conduct of others reasonably foreseeable to her, was 40 grams or more.

*Id.* at 2–3.

In June 2023, the Court held a plea hearing at which Miller pleaded guilty to the lesser-included offenses in both counts with which she was charged. Crim. doc. 741; crim. doc. 1031, Plea Hr'g Tr. at 26:22–26:25. At the hearing, the Court accepted Miller's guilty plea. Crim. doc. 741.

The United States Probation Officer prepared a Presentence Investigation Report (PSR). Crim. doc. 878. The PSR calculated Miller's total offense level as 37 and her total criminal history category as VI. *Id.* at ¶¶ 98, 137. Based upon that total offense level and criminal history category, the imprisonment range that the federal guidelines provided was 360 months to life. *See id.* at ¶ 167. But because the statutorily authorized maximum sentences were less than life, the guideline range was 360 to 960 months. *Id.*

In December 2023, the Court held a sentencing hearing. Crim. doc. 883. The Court adopted the advisory-guideline calculations set forth in the PSR. *See* crim. doc. 1033, Sent. Hr'g Tr. at 19:23–20:5. But the Court sentenced Miller per a lower guideline range that the parties had agreed to in the plea agreement: 292 months to 960 months. *See id.* at 20:10–20:12. Before imposing its sentence, the Court confirmed that Miller remained satisfied with the services rendered her by defense counsel:

> **THE COURT:**   And at the time you pled guilty, you told me you were fully satisfied with the services that Mr. Wooten has performed for you in this case. Since then, have you had enough time to consult with him and answer any questions that you had about the case?
>
> **[MILLER]:**   Yes, sir.

4

> THE COURT:       And do you remain fully satisfied with the services that he has performed for you in this case?
>
> [MILLER]:        Yes, sir.

*Id.* at 2:25–3:8.

Then, the Court enumerated all the materials that it reviewed for the sentencing: all materials available on CM/ECF in connection with Miller's case, including the guilty-plea agreement, the PSR, the United States's sentencing memorandum, sentencing letters from Miller and her family and friends, the United States's sealed supplement, sentencing materials from Miller's co-defendants, and data from Judiciary Sentencing Information. *Id.* at 3:13–4:5. These materials extensively discuss Miller's history of undergoing abuse from men. For example, the PSR notes the following:

> Miller reported being taught to steal at a very young age which became a consistent part of her life. [Miller] recalled sleeping in cars and being neglected. As a result, she and her siblings were placed in foster care during periods of their childhood and were placed in various homes oftentimes separated from one another. Between ages nine and 11, Miller reported being sexually abused by a male gym teacher who would pull her aside daily and engaged Miller in inappropriate sexual behavior. The teacher would make threats to Miller in order to keep her from disclosing the abuse.
>
> . . .
>
> From approximately 2010 to 2020, [Miller] reportedly shared a relationship with [Jeffrey Moore] . . . . Moore was significantly abusive to [Miller] throughout their relationship. Moore forced [Miller] to commit theft to support his drug addiction. [Miller] was hospitalized on more than one occasion due to his physical abuse. Miller reported Moore assaulted her with a knife, placed a firearm to her head while making threats, and used his fists to assault her . . . . One child was born to this relationship . . . . Moore was abusive during Miller's pregnancy and continued to abuse her, their daughter, and Miller's son during their relationship.
>
> . . .

5

> In approximately 2020, [Miller] reportedly began sharing a relationship with [Silas Smith]. Smith was abusive and manipulative. Smith paid her rent and used his support as a way to control Miller.
>
> . . .
>
> Miller has scars on her left leg and right hand as a result of a knife wound; a scar on her left eye as a result of being punched in the face; and a scar on her lip (right side) as a result of being struck with a chair. All these injuries were incurred during her abusive relationship with Jeffrey Moore.

Crim. doc. 878 at ¶¶ 143, 145–46, 148. With the exception of one unrelated typographical error, the Court adopted the PSR as its findings of fact and conclusions of law regarding the advisory guidelines. Crim. doc. 1033, Sent. Hr'g Tr. at 20:13–20:21. And in her letter to the Court, Miller stated:

> Throughout all this I had been involved with the father of my daughter, DM. My son JP, DM, and I endured 10 years of physical, mental, and emotional abuse, clinging to any semblance of family I could. Yet the idea of keeping our family together became secondary to survival.
>
> . . .
>
> I do understand that naivety [sic] is not an excuse, however vulnerability played a very large part in me making the poorest decisions and biggest mistakes of my life. After only 2 months of dating someone I thought was very special, this man and I began to share space. He had the passcode to my home and could come and go as he pleased. When he and the mother of his child began having more problems than he could handle, I thought I made a sensible decision by letting him move in. Instead, I helped him get his own place by renting him an apartment. Clearly this was the wrong thing to do since my new love took full advantage of me when I thought his feelings for me were true. The heartbreak of being played by this man makes my blind involvement in the crimes committed even more devastating.
>
> . . .

6

> Honorable Judge Clark, please grant me leniency when deciding my sentence. I urge you to consider my circumstances and go far below my guidelines.

Crim. doc. 872-1 at 1–3.

After the Court explained the materials it reviewed, the Court took argument and allocution with respect to sentencing. Crim. doc. 1033, Sent. Hr'g Tr. at 7:5–7:6. Wooten argued at length that a host of factors—including the nature of Miller's criminal history, Miller's addiction to stealing, and the fact that many of Miller's convictions were over ten years old—counseled in favor of a 72-month sentence. *Id.* at 7:8–11:20. In support of this proposed downward variance, Wooten also pointed to Miller's history of having been abused and the influence that Griffin had in her crimes:

> And between the ages of 9 and 11, [Miller] found herself being sexually assaulted by the gym teacher at school. So we have this whole track of just not being able to trust any adult.
>
> . . .
>
> So the stealing became a learned and taught behavior and then it become more of an addictive behavior for Ms. Miller. It is something that many of us won't understand because many of us tend to be law-abiding citizens being raised in a balanced home. But Ms. Miller, she's totally unfamiliar with that, and she just understood this nature of just going into stores, taking items and having that background where Mom had her do it, Dad had her do it, and then she got into these relationships with men who would rape, abuse her and also had her going out and stealing and she would provide assistance to these men through her stealing endeavors.
>
> . . .
>
> A sentence of 72 months would allow her to get back—appreciate getting herself mixed up into this horrible drug trade. It's a dangerous drug. It's a drug she had no idea what it was. She didn't know if it was cocaine, heroin, fentanyl or anything else. She just knew she loved Stephen Griffin. He asked her to do things. She did those things for him. She benefitted nothing at all. Financially, she

7

> benefited nothing because she was still out there stealing during this time.

*Id.* at 8:10–8:13, 9:11–9:22, 11:3–11:11.  The Court treated Wooten's argument as a motion for a downward variance, and the Court denied it based on the Court's assessment of the relevant sentencing factors.  *See id.* at 29:12–29:15.

The Court sentenced Miller per the plea agreement's guideline range, which was substantially lower than the PSR's guideline range, and the Court granted the United States's motion for a downward departure.  *Id.* at 29:2–29:6.  Accordingly, the Court sentenced Miller to a below-the-guidelines-range sentence of 240 months imprisonment followed by a four-year term of supervised release.  *Id.* at 29:16–29:22; 31:8–31:11.  The sentence fell below the guidelines range by 33%, or 120 months.  In deciding upon that sentence, the Court considered, in addition to the advisory guidelines and policy statements, "the nature and circumstances of Ms. Miller's offense, the history and characteristics of Ms. Miller, the need to avoid unwarranted sentencing disparities among similarly situated defendants as well as the types of sentences available."  *Id.* at 21:7–21:12.  The Court also explicitly mentioned that it took into account the fact that both a male gym teacher and a former boyfriend abused Miller.  *Id.* at 27:9–27:14.

After sentencing, Miller noted that she did not wish to appeal.  Crim. doc. 892.  She is currently serving her sentence at Carswell FMC in Texas with a projected release date of October 17, 2039.  *See* Find an inmate, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (select "Find By Name"; then enter "Crystal" into the "First" field and "Miller" into the "Last" field; and then click "Search") (last visited June 26, 2025).

### 2. Civil proceedings

In April 2024, Miller timely filed a pro se motion to vacate her sentence pursuant to 28 U.S.C. § 2255.  Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a

8

Person in Federal Custody, No. 4:24-cv-00536-SRC, *Miller v. United States* (E.D. Mo. Apr. 11, 2024), doc. 1 ("Civ. doc."). A month later, Miller, through counsel, moved for leave to file an amended motion. Civ. doc. 4. The Court granted the motion. Civ. doc. 5. Miller filed her amended motion in September 2024—still within one year of the date that her conviction became final—rendering her amended motion timely. *See* civ. doc. 10; 28 U.S.C. § 2255(f)(1); *Anjulo-Lopez v. United States*, 541 F.3d 814, 816 n.2 (8th Cir. 2008) (explaining that a conviction becomes final after period for filing a notice of appeal expires if defendant does not file a direct appeal).

In her amended motion, Miller argues that Wooten provided ineffective assistance of counsel because he failed to seek a downward variance at sentencing based upon Miller's history of abusive relationships with men. Civ. doc. 10 at 4. The United States timely filed its response, civ. doc. 11, and Miller timely filed her reply, civ. doc. 12, rendering Miller's motion, civ. doc. 10, ripe for this Court's review.

## II. Standard

### A. Section 2255

Under section 2255, a federal prisoner "may move the court which imposed [his] sentence to vacate, set aside or correct the sentence" on the grounds that the court imposed "the sentence . . . in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). If a petitioner claims his sentence violates the Constitution or laws of the United States, the petitioner must establish that the violation constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Gomez*, 326 F.3d 971, 974 (8th Cir. 2003)

(first quoting *United States v. Boone*, 869 F.2d 1089, 1091 n.4 (8th Cir. 1989); and then citing Fed. R. Crim. P. 32(d) advisory committee notes to the 1983 amendments). Generally, to obtain section 2255 relief based on a claim, a petitioner must have raised the underlying error on direct appeal. *See Roundtree v. United States*, 885 F.3d 1095, 1097 (8th Cir. 2018). If a petitioner failed to do so, the Court considers the claim procedurally defaulted, rendering it ineffective in establishing a right to section 2255 relief. *See id.*

Three exceptions to this general rule exist. First, "if the error is jurisdictional, the error may be raised on collateral review without being subjected to procedural default analysis." *United States v. Mooring*, 287 F.3d 725, 727 (8th Cir. 2002). Second, if a petitioner raises a constitutional claim, the Court does not consider the claim procedurally defaulted if the petitioner shows cause for the default and actual prejudice. *See Anderson v. United States*, 25 F.3d 704, 706 (8th Cir. 1994); *Reid v. United States*, 976 F.2d 446, 448 (8th Cir. 1992). This "cause and prejudice exception does not apply to nonconstitutional or nonjurisdictional claims that could have been but were not raised on direct appeal." *Anderson*, 25 F.3d at 706 (first citing *Brennan v. United States*, 867 F.2d 111, 120 (2d Cir. 1989); and then citing *Bontkowski v. United States*, 850 F.2d 306, 313 (7th Cir. 1988)). Finally, the Court "will consider a claimed error that could have been raised at trial or on direct appeal if the alleged error was a fundamental miscarriage of justice." *Id.* (citing *Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993) (per curiam)). This exception, however, "applies only when a petitioner shows by clear and convincing evidence that, but for an alleged constitutional error, no reasonable juror would have found the petitioner guilty," *id.* at 706–07 (citing *Wallace v. Lockhart*, 12 F.3d 823, 827 (8th Cir. 1994)), and extends only to claims of factual innocence, *id.* at 707 (first citing *Narcisse v. Dahm*, 9 F.3d 38, 40 (8th Cir. 1993); and then citing *Ramey*, 8 F.3d at 1314).

10

If the petitioner's claims are not procedurally barred, the Court must hold an evidentiary hearing to consider the claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994). A petitioner is entitled to an evidentiary hearing "when the facts alleged, if true, would entitle [the petitioner] to relief." *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996) (quoting *Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986)). However, a court may dismiss a claim without a hearing "if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw*, 24 F.3d at 1043 (citing *Larson v. United States*, 905 F.2d 218, 220–21 (8th Cir. 1990)).

### B. Ineffective assistance of counsel

A petitioner may raise an ineffective-assistance-of-counsel claim for the first time in a section 2255 motion, even if he could have raised the same claim on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003). This exception to the procedural-default rule exists to prevent petitioners from being forced "to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim." *Id.* Additionally, a petitioner's attorney may serve as counsel for both trial and appellate proceedings, and it is unlikely that the attorney would raise a claim of his own ineffective assistance on appeal. *See United States v. Rashad*, 331 F.3d 908, 911 (D.C. Cir. 2003).

To establish ineffective assistance of counsel, a petitioner "faces a heavy burden." *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (quoting *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996)). He must show both that his counsel's performance was deficient and that the deficient performance prejudiced the petitioner's case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Sera*, 267 F.3d 872, 874 (8th Cir. 2001).

11

An attorney's performance is deficient only if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88; *see also Sera*, 267 F.3d at 874. Two substantial impediments exist to making such a showing. First, "a 'strong presumption'" exists "that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689). Second, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (quoting *Strickland*, 466 U.S. at 690).

**III.     Discussion**

Miller argues that Wooten provided her ineffective assistance because he failed to seek a downward variance based on Miller's "abusive serial relationships" and the influence that those relationships had on Miller's crimes. Civ. doc. 10 at 9. But the record plainly shows that Miller can satisfy neither prong of the *Strickland* test.

On reasonableness, the record shows that Wooten argued for a downward variance based on a range of factors, *including* Miller's history of abusive relationships and their influence on her crimes. *See* crim. doc. 1033, Sent. Hr'g Tr. at 8:10–8:13, 9:11–9:22, 11:3–11:11; *see also id.* at 29:12–29:15 (treating Wooten's argument as a request for a variance). That Miller now disagrees with the way that Wooten framed the argument doesn't matter. That Wooten referenced the abusive relationships proves that he made a "thorough investigation of law and facts relevant to plausible options." *Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 690). And Wooten's decision about how to frame the argument amounts to a "[s]trategic choice[]." *Id.* That renders Wooten's conduct at sentencing "virtually unchallengeable." *Id.*; *see also id.* (holding that the law applies a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (quoting *Strickland*, 466 U.S. at 689)).

12

And on prejudice, Miller faces an even steeper uphill battle.  Even if Wooten did act constitutionally deficiently in the manner in which he framed the argument for a downward variance based on Miller's relationship history, that wouldn't change the fact that the Court considered at sentencing not only Wooten's arguments but also the PSR and Miller's own letter to the Court, both of which describe Miller's history of abusive relationships and the effect that those relationships had on Miller's crimes.  *See* crim. doc. 1033, Sent. Hr'g Tr. at 3:13–4:5; *see also* crim. doc. 878 at ¶¶ 143, 145–46, 148; crim. doc. 872-1 at 1–3.  Thus, even if Wooten had argued for a downward variance more extensively, there exists no "reasonable probability that, but for [Wooten]'s unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

For these reasons, the Court finds that Miller has shown neither that Wooten exhibited deficient performance nor that Miller suffered prejudice as a consequence of Wooten's performance.  Accordingly, the Court denies Miller's request for relief under section 2255 on ineffective-assistance-of-counsel grounds.

## IV.   Certificate of appealability

For the Court to issue a certificate of appealability, Miller must make a substantial showing that she suffered the denial of a constitutional right.  *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).  A substantial showing means one indicating that reasonable jurists could debate the issues, a court could resolve the issues differently, or the issues deserve further proceedings.  *Id.*  But as shown in the discussion above, Miller has not made such a showing.  Accordingly, the Court declines to issue a certificate of appealability in this case.

13

## V. Conclusion

The Court finds that the record conclusively establishes that 28 U.S.C. § 2255 does not entitle Miller to relief or an evidentiary hearing. Accordingly, the Court denies Miller's [10] Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. The Court denies as moot Miller's first [1] Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. A separate judgment accompanies this Memorandum and Order.

So ordered this 26th day of June 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE